**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Miami Division

LEVY SIMON and YOUSELINIE
PIERRE SIMON, as Personal
Representatives of the Estate of
JUVON LEROY SIMON,

       *Plaintiff*,

v.

CITY OF FLORIDA CITY, a municipality
within the State of Florida, and
DETECTIVE FRANTZ HARDY
individually and in his capacity
as a City of Florida City Police Officer,
DETECTIVE AURIZ LEZA, individually
and in his capacity as a City of Florida City
Police Officer, and DETECTIVE MARCUS
TERRY, individually and in his capacity
as a City of Florida City Police Officer,

       *Defendants*.
_____/

## COMPLAINT

The Plaintiffs, LEVY SIMON and YOUSELINE PIERRE-SIMON, (collectively

"Plaintiff" or "SIMON") as Personal Representatives of the Estate of JUVON LEROY

SIMON ("JUVON") sues the Defendants, CITY OF FLORIDA CITY ("CITY"), and Florida

City Police Detective FRANTZ HARDY ("HARDY"), DETECTIVE AURIZ LEZA ("LEZA")

and DETECTIVE MARCUS TERRY ("TERRY")  and alleges:

### Nature of the Case

1.    This lawsuit presents claims for damages for the wrongful death of 23-year-old

JUVON, brought by SIMON, as Personal Representatives of his Estate, on

behalf of the estate and his statutory survivors.

1

2.     This action alleges violations of civil rights and other state and federal laws which resulted in JUVON's death on May 30, 2018.

3.     This suit asserts that the Defendants acted illegally, improperly, and negligently in that the acts and/or omissions of the CITY, its Police Department, its police officers, detectives and police supervisors created an atmosphere of hostility and harassment against citizens, including JUVON.

4.     Further, this lawsuit alleges that on May 30, 2018,  Defendant HARDY while doing his job, unjustifiably and without provocation shot and killed JUVON. Said shooting was illegal, negligent, and improper.

5.     As more particularity alleged herein, Defendant CITY, its elected officials, police department, and police officers are legally liable for JUVON's death because of their pattern and practice of failing to properly hire, train, supervise, discipline, and/or retrain their police force in a manner consistent with the protections afforded under the Constitution of the United States of America, federal statutes, and Florida law.

6.     This lawsuit asserts that the City and its police officers named herein were deliberately indifferent to the rights of the public, including JUVON, in failing to have proper protocols for police encounters and the use of force during the police encounter, and in ignoring the rights of its citizens, including JUVON. In so doing, Defendants failed to establish or execute a reasonable review of policy for the consideration and redress of citizen's complaints against police officers.  Such failure resulted in police officers operating on a day-to-day basis without any real concern for internal supervisory review so that "street justice" became

commonplace. This failure resulted in an atmosphere of invulnerability for the members of the police force. The CITY's dereliction of its governmental function all culminated in the shooting of JUVON at 1:11 p.m. on Wednesday afternoon, May 30, 2018 right outside his residence of 1406 NW 2nd Avenue, Apt. 4, Florida City, in Miami Dade County, Florida.

7.     This suit further alleges that JUVON was killed after HARDY fired multiple shots, some from outside and through a closed door with three rounds hitting JUVON, even though immediately prior to the shooting, JUVON was not a threat to HARDY, LEZA, and TERRY, himself, or anyone else.

8.     This suit further alleges that all of the Defendants conspired to cover up the unjustified and thus, unconstitutional shooting by manipulating their testimony to the investigators, and by spoliating critical evidence which would have impeached and contradicted their versions of the event as it truly occurred in an effort to avoid the filing of criminal charges by the Miami Dade County State Attorney's Office and civil liability as well.

9.     Plaintiff seeks damages against Defendants for violation of JUVON's rights under the Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States of America pursuant to 42 U.S.C. §1983, as well as other federal laws. Additionally, Plaintiff asserts state law claims of wrongful death, as well as demand trial by jury.

## Jurisdiction and Venue

10.    This action for damages is brought to redress violations of federally-protected constitutional rights pursuant to 42 U.S.C. § 1983 and 1988, and the Fourth,

Eighth and Fourteenth Amendments to the Constitution of the United States of America, along with supplemental state-law claims for wrongful death.  There are conspiratorial counts under the federal and state tort claims.

11.    This Court enjoys jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(1), (3), and (4), 2201 and 2202; whereas 28 U.S.C. § 1367(a) grants the Court supplemental jurisdiction over the state-law claims.

12.    Furthermore, an additional pendent claim under the laws of the State of Florida for wrongful death is being brought pursuant to Florida Statute §§768.16 – 768.27 (Florida's Wrongful Death Act") and Fla. Stat. § 768.28 (Florida's "Waiver of Sovereign Immunity in Tort Actions").

13.    Venue properly lies in the Southern District of Florida because all events giving rise to this action occurred in Miami-Dade County, Florida.

14.    Notice of this claim has been provided to the Defendants in accordance with Fla. Stat. §768.28 and Plaintiff has satisfied all conditions precedent to bring this lawsuit. See statutory presuit letter attached as **Exhibit A.**

## The Parties

15.    The Plaintiff, SIMON, is and at all times material hereto was an adult resident and citizen of the State of Florida.

16.    SIMON is, pursuant to the laws of the State of Florida, the Personal Representative of the Estate of his adult son, JUVON, and is authorized by law to bring this action.

17.    JUVON was, at the time of his death and at all times material hereto, a resident and citizen of the State of Florida.

18.  JUVON died as a result of injuries sustained on or about May 30, 2018, when he was shot and killed by HARDY, a detective employed by the CITY.

19.  Defendant CITY is responsible through its officers, employees, servants, and agents for enforcing the rules and regulations of Florida City, and for ensuring that its officers, employees, servants, and agents obey the laws of the United States of America and the State of Florida.

20.  Defendant CITY at all times material hereto operated the Florida City Police Department (the "Department").

21.  Detectives HARDY was, at all times material hereto, duly appointed police officers of the Department, acting within the course and scope of their employment and/or acting under color of law, employed by the CITY. The actions of HARDY, as alleged herein were taken under the color of law employed by and serving under Defendant CITY.

22.  Detective LEZA was, at all times material hereto, a duly appointed police officer of the Department, acting within the course and scope of his employment and/or acting under color of law, employed by the CITY. The actions of LEZA as alleged herein were taken under the color of law employed by and serving under Defendant CITY.

23.  Detective TERRY was, at all times material hereto, a duly appointed police officer of the Department, acting within the course and scope of his employment and/or acting under color of law, employed by the CITY. The actions of TERRY as alleged herein were taken under the color of law employed by and serving under Defendant CITY.

**General Allegations**

24.   On or about Wednesday, May 30, 2018, at approximately 1:00 pm, Detective HARDY together with Detectives LEZA and TERRY were canvasing the area of NW 2nd Avenue and 14th  Street in Florida City, Florida in an unmarked police vehicle.

25.   At the time, JUVON was merely walking from his apartment complex in Florida City across the street to another apartment complex.

26.   Upon recognizing JUVON from a prior encounter, Detective HARDY told his colleague to stop and positon the vehicle so that Detective HARDY could exit and confront JUVON. However, there was no reasonable suspicion to approach or confront JUVON and certainly no probable cause to arrest him.

27.   JUVON was not acting suspiciously, he was not committing a crime, he was not carrying a weapon or anything that could reasonably appear to be a weapon; he was simply minding his own business.

28.   As JUVON got closer to the apartment building, Defendant HARDY picked up his pace almost to a run while he was talking on a phone (or a radio). He continued to pursue JUVON into the apartment complex.

29.   JUVON then entered Apt. #4 of 1406 NW 2nd Street, Florida City and closed – but did not lock - the door behind him with Defendant HARDY in brisk pursuit.

30.   HARDY tried to open the door but was unable to gain access to the apartment. He then drew his firearm and fired two rounds through the door and was now able to open it. Once the door opened, he fired three more rounds at JUVON who was standing at least 6 feet away and sideways to Defendant HARDY.

31.  HARDY unjustifiably and without provocation shot JUVON three times - as stated - on the left side.

32.  JUVON was not armed. He did not display any sign of aggression towards HARDY when HARDY opened fire on JUVON.  There was no direct, immediate threat to HARDY, any citizen or police officer.  Indeed, inside the apartment were Defendant HARDY and JUVON and three other civilian witnesses, two of which were upstairs and did not witness the shooting; Breon Lester is the other witness who was downstairs and witnessed the shooting.

33.  Rather than render first aid to JUVON, HARDY quickly exited the apartment, ran to the undercover police vehicle, retried a satchel and went back inside the apartment closing the door behind him.

34.  Multiple police personnel responded to the scene as well as fire rescue who pronounced JUVON dead on the scene. The traditional police shooting investigation followed.

35.  The Miami Dade Police Department ("MDPD") investigated the shooting with the assistance of the City of Florida City Police Department.

36.  The MDPD investigators took a lackadaisical and apparently purposeful bland statement from Mr. Lester clearly calculated to protect the shooting officer Defendant HARDY. Even in his sworn statement, Mr. Lester questioned why the MDPD investigators were hurried to finish the interview and were not asking him the right, relevant questions. His 30 minute interview ended with efforts by the interviewing investigator to get him to acknowledge that JUVON was known to carry firearms leaving out the most important question which was whether it

appeared to Mr. Lester that it was necessary for Defendant HARDY to use deadly force against JUVON.  Clearly, the investigator knew that no question was better than that question with a "no" for an answer which would have triggered a serious problem for Defendant HARDY.

37.    Defendant HARDY refused to cooperate in the investigation and thus did not give a sworn statement with his account of what occurred.

38.    Defendants LEZA and TERRY claimed to wye witness the shooting.  However, if Mr. Lester is to be believed, they were not able to do so because the shooting took place inside the apartment. Mr. Lester's testimony rings more true because there was no blood outside the apartment and 2 of the casings from the five rounds shot which were recovered outside of the apartment were made through a closed door and the other three recovered were from indie the apartment.

39.    The sworn statements of Defendants LEZA and TERRY are shamefully, embarrassingly and purposefully short and obviously perjured, serving the interests of their fellow detective, HARDY.

40.    After the shooting, Mr. Lester provided an affidavit which answered questions never answered by the MDPD homicide investigators. **Exhibit B**.

41.    In short and in sum, Mr. Lester's testimony is that he was present at Apt. 4 when the shooting occurred; that JUVON entered the apartment before he was shot; that he tried to close the door behind him and that JUVON was unarmed at the time. He has testified that someone was trying to open the door from the outside and he – Mr. Lester – never heard "Police", "Stop" or anything else spoken by the individual outside of the apartment.

42.   According to Mr. Lester, a minute or two after JUVON was shot and lay dying on the floor, he saw HARDY hurry out of the apartment and run towards the unmarked police vehicle, retrieve a small bag and ran back inside the apartment, all by himself. Defendant HARDY then closed the door behind him with no other officer inside the apartment. Shortly thereafter, HARDY came out holding a gun. That gun was either in the apartment before the shooting or it was placed there as a "throw down" by HARDY which would explain why he violated all police protocol, abandoned a dying civilian who needed first aid to get the bag containing the desperately needed "throw down" weapon to have a defense to the unjustified shooting.

43.   Due to a lack of gunpowder stipling on JUVON's body determined by the Autopsy Report conducted by the MDC Medical Examiner's office, JUVON had to have been at least 6 feet away from Defendant HARDY when he unloaded 3 rounds at JUVON who, we know, based on the autopsy report, was not even facing Defendant HARDY at the time bookcase all three rounds struck JUVON on his left side.  In short, the forensic evidence demonstrates that Defendant HARDY could not have been in reasonable, objective fear for his life when he used deadly force against JUVON.

44.   Somebody from law enforcement – we don't currently know exactly who but will once discovery is permitted in this case – obtained video footage from three cameras from a nearby apartment building and erased segments that captured the critical second of video evidence that preceded the shooting.  This spoliation

of evidence was apparently overlooked by the MDPD homicide investigator and the Miami Dade County State Attorney's Office ("SAO").

45.   A public records search for the disciplinary profile of Defendant HARDY only going back to 2014, demonstrates a troubled officer to say the least, and, at worst, a real renegade officer. A copy of HARDY's profile sheet is attached hereto as **Exhibit C.**

46.   It shows 4 policy violations, 1 act of misconduct involving following procedures, 4 acts of misconduct for lack of professionalism, 1 complaint for discourtesy and 1 for false arrest and harassment.   It documents 2 use of force incidents, 4 accidents within a three year period, 2 of which were preventable. Last, as discipline for all these acts, there are 2 letters of mere "counseling" as reprimands.

47.   A public records search for the disciplinary profile of Defendant LEZA shows that he is just as aggressive and reckless and Detective HARDY, but again, it shows a failed leadership because there is no progressive discipline also clearly warranted against LEZA. LEZA racked up 6 on-duty vehicle crashes, 3 of which were preventable, all in a 10 year period. Yet, he received only 2 letters of written counseling and one letter of reprimand; that is not progressive discipline. He is also an officer who rules with a "heavy hand". He is credited with 3 excessive use of force complaints and although the findings were favorable to him – not surprising in a police department where the code of silence rules – 3 civilians took the time and had the courage to report him for being physically abusive.  A copy of LEZA's profile sheet is attached hereto as **Exhibit D.**

48.    A public records search for the disciplinary profile of Defendant TERRY displays
       a similar pattern to those of his colleagues above, and he apparently went to the
       same driving school as LEZA and HARDY and ties with LEZA for first place with
       6 crashes in 9 years, 3 of which were preventable. And to be sure and further
       evidenced of the leadership's evenhandedness with no progressive discipline for
       each preventable accident, TERRY only received a "written reprimand".  There is
       an interesting entry of discipline that cannot be tracked to a citizen's complaint or
       preventable accident that occurred on August 27, 2015 with this detective. It was
       a "violation of department policy" for "misuse of a computer system". Upon
       information and belief, this would be using his police computer for a non-official
       purpose, a violation which must be reported to the FDLE and which could subject
       the offending officer to suspension or revocation of his FDLE certificate and even
       criminal charges.

49.    TERRY has 8 complaints against him which show that he is the most rogue of
       the three detectives.   Five of the complaints are from civilians and range from
       conduct unbecoming a police officer to misconduct and one being a claim of
       missing property from a civilian. Two of these civilian complaints show as
       "closed", suggestive that there was a finding of guilt because when there is not
       such a finding, the result reads as "unfounded" or "exonerated". There is also a
       serious entry in this profile which shows an "internal investigation" for "felony
       conduct" as well. Last, there are 6 reported uses of force in this officer's profile,
       highly indicative of a physically abusive officer. A copy of TERRY's profile sheet
       is attached hereto as **Exhibit E.**

50.   The personnel records obtained thus far for these officers do not show any progressive discipline, any remedial training or any change, cessation or reduction in complaints or uses of force following the first ones.

51.   HARDY's killing of JUVON is but one of many in a rash of questionable officer-involved incidents, many including the use of force and others that while not necessarily use of force related, nevertheless demonstrate a custom, policy and practice of a mismanaged police department lacking professionalism, leadership and accountability with no progressive discipline administered by this police department.

**The Commencement of Conspiracy to Massively Coverup the Bad Shooting**

52.   Although this complaint is at the very early pleading stage without discovery, an investigation conducted by Plaintiff's counsel reveals a clear and frightening cover-up which began immediately following the shooting and continued thereafter with various manners and means and with one objective - to protect Detective HARDY and make this bad shooting look justified.

**i). The Adulterated-Spliced and Diced Video Taped Footage to Eliminate JUVON's Actions Just Before The Shooting.**

53.   As part of the investigation, law enforcement obtained video footage[1] from three fixed directional video cameras attached at three different locations on the outside of an apartment building located across the street/avenue from where the shooting took place. Two of the cameras are located on the opposite ends of the apartment building and one is centrally located in the middle of the apartment

---

[1] As stated above, at this time we do not know whom, but discovery will lead us there.

building between the other two. The video footage from each camera reflecting the time by hour, minutes and second, continuously running were synchronized.

54.   It is clear that all three cameras were identically synchronized to each other from a time-clock standpoint. The first camera captures the initiation of the foot chase and then it stops at 13:11:57 resuming at 13:12:53, 56 seconds later leaving out crucial evidence. In other words, almost 1 minute of the recording has been spliced and removed from the video footage. The second camera captures the initiation of the foot chase and then it stops at 13:10:19, only to resume at 13:12:26, 2 minutes and 7 seconds later. In other words, over 2 minutes of this recording was spliced and removed from the footage. The third camera – the one in the middle – stops at 13:12:49 and resumes at 13:13:10, 21 seconds later. Again, deleting the most critical evidence of the video related to the events just before the shooting. It is not a coincidence that the "missing footage" for all three cameras is exactly the point in time capturing the interaction between Detective HARDY and JUVON right before the shooting.    A copy of the 3 video tapes referenced hereto are attached as composite **Exhibit F**.

55.   The video footage for all three video has been clearly tampered with. The tampering is so obvious, it is ridiculous.

56.   The defense investigation identifies when and where JUVON was just before the shooting and would have appeared on the video, but the footage is conveniently spliced to hide where JUVON was, what he was doing and all of his interactions right before Detective HARDY began to pursue him on foot after exiting the police vehicle. The deletion allows the Defendant detectives to "fill in the blanks"

to meet the need of the moment and make this a "justified" shooting. They could testify as they did – that JUVON was carrying a suspect weapon. Of course if the video showed that, there would have been no need to get rid of it and the Defendant officers and the CITY would have been bannering it to the State Attorney's Office ("SAO") and the Internal Affairs section of the CITY police department. One thing is certain, JUVON nor his family did.

57.  As more fully discussed and described below, the way the Defendants described their actions to the MDPD homicide investigator in parts of their sworn statements are still belied by what the video footage demonstrates – even as doctored.

58.  For example, the MDPD homicide report states that CITY officers HARDY, TERRY and LEZA were in the area on an unrelated investigation but all riding together in an unmarked police vehicle, a Ford Expedition. The report goes on to say that the detectives were walking back to their vehicle when they suddenly observed JUVAN, "*walking from the apartment complex, located on the Southside of NW 14 Street towards the intersection of NW 2 Avenue. Mr. Simon was known to Detectives Terry and Hardy from prior incidents and he was known to carry a firearm". The Detectives observed that Mr. Simon was holding on to a heavy object under his gym pants as he walked across the street. The three detectives entered their police vehicle and Detective Leza reversed the vehicle to get close to MR. SIMON. By that time, MR. SIMON was walking through the alleyway behind the apartment complex at the incident location. Immediately thereafter, DETECTIVES LEZA and HARDY exited the vehicle while*

*DETECTIVE TERRY was still indie the vehicle getting ready to exit as well. DETECTIVE TERRY heard DETECTIVE HARDY identify himself and tell MR. SIMON not to go into the apartment.  DETECTIVE TERRY looked in their direction and saw that as DETECTIVE TERRY was exiting the vehicle, he heard DETECTIVE HARDY say, 'Don't do it. Don't do it. Drop it. Drop it'. Immediately thereafter DETECTIVE TERRY heard four gunshots".*

59. A reconstruction of the events by looking at the "gutted" video footage tells quite a different story - police officers covering for a brother officer to cover up this bad shooting to make it appear as a good one.

**ii). The False Sworn Testimony to Protect Detective Hardy**

60. The second part of the cover up relates to the perjured, self-serving statements by the individual Defendants to the investigating MDPD homicide detectives, likely because they were not aware of the existence of the video footage – doctored up as it was.  For example, Defendant LEZA testified he heard HARDY telling JUVON to "not do it" – meaning, not go in through the apartment door, he could not have actually seen JUVON pull out a weapon from his waistband before HARDY shot him multiple times, and witness, Breon Lester, testified that JUVON did not have a weapon on him when HARDY shot him.

61. Aside from the differentiation of the Defendant officers' testimony from the "salvaged" video, their statements are belied by the sworn testimony of Mr. Lester.

## COUNT I – VIOLATION OF CIVIL RIGHTS UNDER § 1983 AGAINST THE CITY

62.   Simon re-alleges the allegations of paragraphs 1-61, *supra*, and incorporates them as if stated herein in full.

63.   At all times material hereto, Defendant CITY, as represented by the acts of its employees, permitted, tolerated and caused a pattern and practice of unjustified, unreasonable, and/or illegal uses of force against members of the public by police officers of the Defendant CITY. Although such acts were improper, police officers involved were not prosecuted and/or disciplined and/or retrained. In fact, some of said incidents were covered up with official claims that the police officers' acts were justified and proper. As a result, the CITY police officers, including HARDY, were caused and encouraged to believe that members of the public could be subjected to illegal uses of force and that such illegal uses of force would be permitted by CITY.

64.   In the instant matter, HARDY acted at all times material hereto under color of law and within the course and scope of his employment as an officer of the Florida City Police Department.

65.   A reasonable officer standing in the shoes of HARDY and confronted with the same circumstances would believe that no force—much less deadly force—was necessary in the situation.  JUVON had committed no crime.  He posed no threat to the safety of HARDY, himself, or others.  Indeed, JUVON, was not even acting suspiciously or committing any crime at the time of the approach.  There was not ever reasonable suspicion to approach him. In Detective HARDY's world,

however JUVON was guilty of being known to HARDY as a person who allegedly carried a gun" even though JUVON had never been arrested with a firearm.

66.    HARDY shot and killed JUVON rather than attempting to follow him until back-up officers arrives and or by tasing him or taking more precautionary courses of action.

67.    The CITY was responsible for following and implementing all relevant laws, rules, regulations, and policies with regard to screening, hiring, retaining, training, supervising, controlling, disciplining, and assigning to duties the officers of the Florida City Police Department.

68.    The CITY was deliberately, callously or recklessly indifferent to the rights of individuals, particularly JUVON, in that it instituted a custom or policy of negligently, recklessly, or willfully failing properly to screen, hire, retain, train, supervise, control, discipline, and assign to duties the officers of the Florida City Police Department.

69.    The Department and the CITY had a custom and practice of using excessive force, including lethal force when the circumstances called for less-than-lethal force or no force, against individuals such as JUVON.

70.    The Department and the CITY had a custom and practice of using excessive force, including lethal force when the circumstances called for less-than-lethal force or no force, more frequently than officers in other similarly-sized and similarly-situated cities.

71.    The Department and the CITY had a custom and practice of using excessive force, including lethal force when the circumstances called for less-than-lethal

force or no force, when alternative means of handling the situation as described above were available.

72. The Department and the CITY failed by custom and practice to have any effective policy or procedure to prevent the use of excessive force against individuals such as JUVON.

73. The CITY failed to determine whether members of the Department, particularly HARDY, posed a threat to the public as a result of their propensity to commit unlawful acts and to engage in unprofessional activity and improper use of force.

74. The Department and the CITY acted with deliberate, callous, or reckless indifference to the constitutional rights of JUVON.

75. The CITY knew or should have known that its deliberate, callous, or reckless indifference foreseeably would result in injury to members of the public, including JUVON.

76. In light of the excessive number and frequency of complaints against these and other CITY officers, the need for the CITY to train or retrain officers on the use of force and to investigate and discipline officers involved in use of force was obvious.

77. Despite its knowledge of the dangerous propensities of the members of the Department, particularly HARDY, the CITY failed and refused to remove such members of the Department from their positions as police officers, failed and refused to take meaningful disciplinary action against such members of the Department, and failed to provide redress for members of the public, such as JUVON, who have been injured thereby.

78. The CITY, through its deliberate, callous, or reckless indifference, failed to ensure that the members of the Department, particularly HARDY, while acting within the course and scope of their employment and while acting under color of law, would not violate the constitutional and statutory rights of the public, including JUVON.

79. The Florida City Police Department, though its officers, maintained a custom or policy of using excessive force as evidenced by its failure to impose progressive discipline for misconduct.

80. The CITY caused, permitted, and tolerated a pattern and practice of unjustified, unreasonable, unlawful, and excessive use of force against members of the public by officers of the Department, and failed to prosecute, discipline, or train the officers involved, causing and encouraging the members of the Department to believe that individuals could be subjected to the use of excessive force and that the CITY would permit and protect such use of excessive force.

81. In demonstrating the CITY's stellar stewardship with CITY Police Chief Pedro Taylor at the helm, in or about 2013, Chief Taylor showed a sex tape to two ladies - a mother and daughter - who worked for the City. The sex tape depicted another Florida City police officer who was the supervisor of one of the ladies. The ladies sued the CITY for sexual harassment. The City's own investigation concluded that the Chief may have used poor "judgment".

82. Another example, one CITY officer, Ken David Armenteros was involved in serious misconduct. On September 13, 2016, while off-duty and on his personal motorcycle, Armenteros requested emergency back-up after a confrontation

outside a known "drug house" in Florida City with a man who was later arrested by responding Florida City police officers. An investigation revealed that Armenteros had materially and fraudulently misrepresented the facts supporting the arrest of the other man – Christopher Maurice Lewis.

83.   In or about 2019, Gillian Palacios sued the CITY and Florida City Officer Marcus Terry – the same Marcus Terry sued herein - for fatally but unnecessarily using excessive force by shooting Ms. Palacio's dog. The complaint charges negligence, intentional infliction of emotional distress and violations of U.S.C. §1983.

84.   The above-described conduct represents a pattern of poor leadership and practice by which members of the public were injured or killed by the intentional and/or reckless misconduct of the CITY's police officers and/or that serious incompetence or misbehavior and excessive use of unnecessary force was widespread throughout the Department.

85.   The CITY established and maintained a system of reviewing incidents and complaints of abuse of authority, such as, *inter alia*, the excessive use of force by members of the Department, that failed to identify the abuse of authority and use of excessive force as such and failed to subject the officers involved to appropriate supervision, discipline, and training, such that it has become the custom, policy, pattern, and practice of the CITY to encourage and tolerate such abuse of authority and use of excessive force.

86.   The CITY through the Department, has maintained a longstanding, wide spread history of failing to properly hire, train, supervise, and/or discipline its officers for,

*inter alia*, illegal uses of force, even though there has been repeated, widely publicized notice of the unlawful and improper conduct of its employees.

87.   The above referenced acts, omissions, policies, and customs of the CITY caused its police officers, including Defendant HARDY, to believe that such acts of improper uses of force would not be properly monitored by supervisory officers, and would not be properly investigated or sanctioned, but instead would be tolerated. The foreseeable result being that officers, like Defendant HARDY, were more likely to use improper or excessive force.

88.   The actions of the Department and the CITY violated JUVON's clearly established, well-settled, and constitutionally protected rights to not be deprived of his life, to not be deprived of his liberty without due process of law, and to be free from the use of excessive, unreasonable, and unjustified force against his person.

89.   JUVON was a victim of such abuse of lawful authority and Defendant HARDY's illegal acts were the direct result of the above-described acts, omissions, policies, or customs of the CITY.

90.   As a direct and proximate result of the deprivation of his constitutionally protected rights, JUVON lost his life and incurred damages.

91.   The Plaintiff, SIMON, as the Personal Representative of the Estate of JUVON, claims damages for the wrongful death of JUVON, including but not limited to the loss of his income, net accumulations, funeral expenses, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and

advice, as well as physical pain and suffering and emotional trauma and suffering.

92. The law is clear in the Eleventh Circuit that an officer loses qualified immunity when his/her wrongful acts are conducted outside the scope of their discretionary duty when the alleged wrongful acts occurred. *Rich v. Dollar*, 841 F.2d 1558 (11th Cir. 1988). Qualified immunity does not exist where gross incompetence or neglect of duty are present. *Malley v. Briggs*, 475 U.S. 335, 336 (11th Cir. 1998).

## COUNT II – VIOLATION OF CIVIL RIGHTS UNDER § 1983 AGAINST HARDY

93. SIMON re-alleges the allegations of paragraphs 1-61, *supra*, and incorporates them as if stated herein in full.

94. HARDY, when he shot and killed JUVON, subjected JUVON to the deprivation of clearly established rights, privileges, and immunities secured by the Constitution and laws of the United States, including the right to be free from unreasonable seizure, the right to not be deprived of life and liberty without due process of law, and the right to be free from the use of excessive force against his person.

95. HARDY's conduct was committed with deliberate, callous, or reckless indifference to JUVON's constitutional rights.

96. Any reasonable officer standing in HARDY's shoes would have known that HARDY's conduct foreseeably would result in the deprivation of JUVON's constitutional rights.

97. Alternative means, other than the use of lethal force, were available to handle the situation.

98. In HARDY's interaction with JUVON, there was at stake no governmental interest: JUVON had committed no crime; JUVON was not a threat to HARDY, himself, or others; JUVON was not actively resisting HARDY; JUVON was not fleeing.

99. As a direct and proximate result of the deprivation of his constitutionally protected rights, JUVON lost his life and incurred damages.

100. The Plaintiff,  SIMON, as the Personal Representative of the Estate of JUVON, claims damages for the wrongful death of JUVON, including but not limited to the loss of his income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice, as well as physical pain and suffering and emotional trauma and suffering.

**WHEREFORE,** the Plaintiff, SIMON, as the Personal Representative of the Estate of JUVON, prays that this Honorable Court enter judgment against the Defendant, HARDY for violating 42 U.S.C. § 1983, declare the acts of HARDY violative of JUVON's constitutionally protected rights, award compensatory damages, award punitive damages, and award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), along with any and all other relief the Court deems proper and just.

## COUNT III –CONSPIRACY BETWEEN THE CITY AND DEFENDANTS HARDY, LEZA AND TERRY (§1983 FEDERAL CLAIM)

101. SIMON re-alleges the allegations of paragraphs 1-61, *supra*, and incorporates them as if stated herein in full.

102. On or about May 30, 2018 through and including the conclusion of the FDLE and MDPD investigations, each and every one of the Defendants conspired, confabulated, colluded or otherwise agreed to commit one or more unlawful acts.

103.   The object of the conspiracy was to obstruct the official MDPD shooting investigation in a manner that would clear HARDY and the Defendant CITY from any liability or it was otherwise an unjustified shooting and therefore, a homicide,

104.   The manner and means of the conspiracy was to provide at least partial, but materially false information to the MDPD homicide investigators in a manner that would have appeared to have made Detective HARDY's use of deadly force justified.

105.   Another manner and means of the conspiracy was to tamper with and remove critical, relevant and material parts of the three video footages in order to be able to liberally create whatever story was necessary to defend Detective HARDY's actions without fear of impeachment by this objective evidence.

106.   Some, but not all of the overt acts of the conspiracy include the false statements by LEZA and TERRY to the MDMD homicide investigators and tampering with the video footage evidence.

107.   This Court has concurrent jurisdiction of this claim for a violation of civil rights.

108.   This claim is brought against all of the Defendants for their engagement in a conspiracy to conceal and/or cover-up the events that occurred to deprive the Plaintiff of their constitutional rights.

109.   These Defendants, and others, for the purpose or impeding, hindering, obstructing or defeating the due course of justice with intent to deny the Plaintiffs of equal privileges and immunities under the law.

110.   More specifically, these Defendants conspired with one another to secret and/or alter facts that took place on the date of the incident to conceal and limit the

Defendants' legal liability in violation of the rights, privileges, liberties and immunities secured to the Plaintiffs by the United States Constitution.

111.   As a result, Plaintiff suffered severe emotional and physical injury, mental anguish and loss of capacity for the enjoyment of life. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future.

112.   The law is clear in the Eleventh Circuit that an officer loses qualified immunity when his/her wrongful acts are conducted outside the scope of their discretionary duty when the alleged wrongful acts occurred. *Rich v. Dollar*, 841 F.2d 1558 (11th Cir. 1988). Qualified immunity does not exist where gross incompetence or neglect of duty are present. *Malley v. Briggs*, 475 U.S. 335, 336 (11th Cir. 1998).

WHEREFORE, Plaintiff demands judgment for damages against the Defendants and any other relief this Court deems just and appropriate.

## COUNT IV – WRONGFUL DEATH AGAINST THE CITY (STATE TORT)

113.   SIMON re-alleges the allegations of paragraphs 1-61, *supra*, and incorporates them as if stated herein in full.

114.   This is an action for damages brought pursuant to the Florida Wrongful Death Act, sections 768.28 and 768.16 to .26, Florida Statutes.

115.   SIMON has been named Personal Representatives of JUVON's Estate.

116.   JUVON has waived all rights to any claim for damages resulting from his death and all rights to inherit from the Estate, leaving LEVY SIMON as the sole potential beneficiary of a recovery in this action.

117.   At all times material hereto, Defendant HARDY was an agent, servant, or employee of the CITY, acting within the course and scope of his employment.

118.   At all times material hereto, Defendant HARDY used his firearm with the knowledge, consent, and permission of the CITY.

119.   Police officers have a common-law duty to exercise reasonable care in carrying out their law-enforcement responsibilities.

120.   HARDY breached that duty by using his firearm in a careless and negligent manner so as to legally, directly, and proximately cause the wrongful death of JUVON.

121.   A reasonable officer standing in HARDY's shoes and confronted with the same circumstances would believe that no force—much less deadly force—was necessary in the situation.

122.   Alternative means of handling the situation were available to HARDY.

123.   As a direct and proximate result of the HARDY's breach of his duty, JUVON was killed.

124.   As a further direct and proximate result of HARDY's breach of his duties, SIMON suffered damages, including the loss of JUVAN's support and services, mental pain and suffering, and funeral and burial expenses; the Estate of JUVON the loss of prospective net accumulations.

125.   The CITY is vicariously liable for the actions and omissions of HARDY, who was acting within the course and scope of his employment when he shot and killed JUVAN.

**WHEREFORE,** in light of the foregoing, the Plaintiff, LEVY SIMONS, as the Personal Representative of the Estate of JUVON, prays that this Honorable Court enter judgment against the Defendant, the CITY, and award damages for loss of support and

services, mental pain and suffering, funeral and burial expenses, and lost prospective net accumulations, along with all other relief the Court deems proper and just.

### COUNT V – WRONGFUL DEATH AGAINST DETECTIVE HARDY (STATE TORT)

126.    SIMONS re-alleges the allegations of paragraphs 1-61, *supra*, and incorporates them as if stated herein in full.

127.    This is an action for damages brought pursuant to the Florida Wrongful Death Act, sections 768.16 to .26, Florida Statutes.

128.    SIMONS has been named Personal Representatives of JUVON's Estate.

129.    JUVON has waived all rights to any claim for damages and all rights to inherit from the Estate, as a result of his death, leaving SIMONS as the sole potential beneficiary of a recovery in this action.

130.    Police officers have a common-law duty to exercise reasonable care in carrying out their law-enforcement responsibilities.

131.    HARDY breached that duty when he shot JUVON three times.

132.    A reasonable officer standing in HARDY's shoes and confronted with the same circumstances would believe that no force—much less deadly force—was necessary in the situation.

133.    Alternative means of handling the situation were available to HARDY.

134.    HARDY's conduct in interacting with JUVON was committed in a manner exhibiting wanton and willful disregard of human rights and safety.

135.    As a direct and proximate result of HARDY's breach of his duty, JUVON was killed.

136.    As a further direct and proximate result of HARDY's breach of his duties, SIMONS suffered damages, including the loss of JUVON's support and services, mental pain and suffering, and funeral and burial expenses; the Estate of JUVON suffered the loss of prospective net accumulations.

**WHEREFORE,** in light of the foregoing, the Plaintiff, LSIMONS, as the Personal Representative of the Estate of JUVON, prays that this Honorable Court enter judgment against the Defendant, HARDY and award damages for loss of support and services, mental pain and suffering, funeral and burial expenses, and lost prospective net accumulations, as well as punitive damages, along with all other relief the Court deems proper and just.

## COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, PAIN AND SUFFERING AGAINST DETECTIVE HARDY AND THE CITY (STATE TORT)

137.    SIMONS re-alleges the allegations of paragraphs 1-61, *supra*, and incorporates them as if stated herein in full.

138.    The CITY through Detective HARDY acted unreasonably and in disregard of human rights, safety or property and acted in bad faith and with malicious purpose and/or in a manner exhibiting wanton and willful disregard of the JUVON's rights.

139.    The CITY through Detective HARDY engaged in extreme and outrageous conduct going beyond all possible bounds of decency and is regarded as shocking, atrocious and utterly intolerable in a civilized community, and acted with gross negligence.

140. The CITY through HARDY acted so wantonly careless and in disregard of the Plaintiff's human rights and acted with malicious purposes to cause severe emotional distress.

141. The CITY through HARDY's actions were the legal cause of the severe emotion distress to the Plaintiffs by:

a. Acting deliberate or reckless thereby inflicting mental suffering and anguish.

b. HARDY's conduct was outrageous.

c. HARDY's conduct caused the emotional stress; and

d. the Plaintiff's emotional stress and mental suffering is severe as a result.

142. As a result, Plaintiff suffers severe emotional and physical injury, mental anguish and the loss of capacity for the enjoyment of life,

143. As a further direct and proximate result of the CITY's and HARDY's breach of his duties, SIMONS suffered damages, including the loss of JUVON's support and services, mental pain and suffering, and funeral and burial expenses; the Estate of JUVON suffered the loss of prospective net accumulations.

**WHEREFORE,** in light of the foregoing, the Plaintiff, SIMONS, as the Personal Representative of the Estate of JUVON, prays that this Honorable Court enter judgment against the Defendant, HARDY and award damages for loss of support and services, mental pain and suffering, funeral and burial expenses, and lost prospective net accumulations, as well as punitive damages, along with all other relief the Court deems proper and just.

## COUNT VI –CONSPIRACY BETWEEN THE CITY AND DEFENDANTS HARDY, LEZA AND TERRY (STATE TORT)

144. SIMON re-alleges the allegations of paragraphs 1-61, *supra*, and incorporates them as if stated herein in full.

145. On or about May 30, 2018 through and including the conclusion of the FDLE and MDPD investigations, each and every one of the Defendants conspired, confabulated, colluded or otherwise agreed to commit one or more unlawful acts.

146. The object of the conspiracy was to obstruct the official MDPD shooting investigation in a manner that would clear HARDY and the Defendant CITY from any liability or it was otherwise an unjustified shooting and therefore, a homicide,

147. The manner and means of the conspiracy was to provide at least partial, but materially false information to the MDPD homicide investigators in a manner that would have appeared to have made Detective HARDY's use of deadly force justified.

148. Another manner and means of the conspiracy was to tamper with and remove critical, relevant and material parts of the three video footages in order to be able to liberally create whatever story was necessary to defend Detective HARDY's actions without fear of impeachment by this objective evidence.

149. Some, but not all of the overt acts of the conspiracy include the false statements by LEZA and TERRY to the MDMD homicide investigators and tampering with the video footage evidence.

150. This Court has concurrent jurisdiction of this claim for a violation of civil rights.

151.    This claim is brought against all of the Defendants for their engagement in a conspiracy to conceal and/or cover-up the events that occurred to deprive the Plaintiff of their constitutional rights.

152.    These Defendants, and others, for the purpose or impeding, hindering, obstructing or defeating the due course of justice with intent to deny the Plaintiffs of equal privileges and immunities under the law.

153.    More specifically, these Defendants conspired with one another to secret and/or alter facts that took place on the date of the incident to conceal and limit the Defendants' legal liability in violation of the rights, privileges, liberties and immunities secured to the Plaintiffs by the United States Constitution.

154.    As a result, Plaintiff suffered severe emotional and physical injury, mental anguish and loss of capacity for the enjoyment of life. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment for damages against the Defendants and any other relief this Court deems just and appropriate.

## Jury Demand

155.    SIMON demands a trial by jury of all issues so triable as of right.

Dated this 29th day of May, 2020.

Respectfully submitted,

 /s/ Richard J. Diaz
Richard J. Diaz, Esq. (F.B.N. 0767697)
Richard J. Diaz, P.A.
3427 Ponce de Leon Blvd
Coral Gables, FL 33434
P: (305) 444-7181

F: (305) 444-8178